**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DISTRICT**

| | |
|---|---|
| **DANYETTA WALKER and JOSEPH WALAWSKI, individually and on behalf of all others similarly situated,** ) ) ) | **CLASS ACTION COMPLAINT** |
| ) | |
| **Plaintiffs,** ) | |
| **v.** ) | **Case No. _____** |
| ) | |
| **CITY OF CHICAGO, a municipal corporation, and UNITED ROAD TOWING, INC., a Delaware corporation,** ) ) | **JURY DEMAND** |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

## COMPLAINT

Plaintiffs Danyetta Walker and Joseph Walawski (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, complain against Defendants City of Chicago (the "City") and United Road Towing, Inc. ("United Road Towing" or "URT") (collectively, "Defendants") as follows:

### INTRODUCTION

1.      In 2017, the City of Chicago towed 19,665 cars.[1]  Every last one was parked legally.  No ticket was issued.  They were all in good condition.  None were abandoned, blocked traffic, or otherwise posed a hazard to the public.  They were involved in no crime and their drivers were not arrested.  These cars were all towed for just one reason: the City of Chicago wanted its money.

---

[1]  Elliott Ramos, *Chicago's Towing Program is Broken*, WBEZ NEWS (Apr. 1, 2019), http://interactive.wbez.org/brokentowing/?_ga=2.182889636.302271072.1573669407-690195108.1572997635.

2.      Of course the City tows far more than 19,665 cars each year.[2]  These particular cars were singled out because the owners of the vehicles owed ticket debt to the City.  Under the Municipal Code of Chicago ("Municipal Code" or "MCC"), as soon as a vehicle owner has two tickets that are unpaid for more than a year, or three unpaid tickets at any time, that owner faces a rapidly escalating campaign of debt collection waged by the City and its agencies.  *See* MCC § 9-100-120(b).

3.      First, the City immobilizes or "boots" the car.  *See* MCC § 9-100-120(b).  The owner of the vehicle then has 24 hours to pay all outstanding fines, penalties, boot fees, administrative fees, attorney's fees, and collection costs or the car will be towed and impounded.  *See* MCC § 9-92-080(b); 9-100-120(c), (d).[3]  In a typical case involving three speed-camera tickets, that cost is $832.[4]  Most Chicagoans just cannot raise that kind of money in that little time.

4.      If the debt is not paid, the car is towed and impounded.  The fees accelerate: a $150 tow fee, a $20 per day storage fee for the first 5 days, and a daily $35 fee thereafter.  *See* MCC § 9-92-080(b).  Taking the example above and adding a tow and ten days of impoundment now

---

[2] In 2017, the total number of cars towed by the City was nearly 94,000. *See* Elliott Ramos, *Takeaways From Our Investigation Into Chicago's Broken Towing Program*, WBEZ NEWS (Mar. 31, 2019), www.wbez.org/wbez-news/takeaways-from-our-investigation-into-chicagos-broken-towing-program/21106328-2146-4f38-9938-7e25fc3b3b92.

[3] Under new legislation, the owner of vehicles towed after Sept. 19, 2019 may request additional time "as provided in rules" before the tow.  *See* MCC § 9-100-120(c) (eff. Sept. 18, 2019).  The only extension available, however, is an additional 24 hours. *See* Booted Vehicle Information, https://www.chicago.gov/city/en/depts/fin/supp_info/revenue/boot_tow_information/booted_vehicle_information.html.

[4] The cost of each ticket at this point, including late payment penalty and collection costs, is typically $244 ($244 x 3 = $732), plus a $100 boot fee.  *See* MCC § 9-100-020(d) ($100 fine); MCC § 9-100-050(e) (doubling fine if not paid in 25 days); Parking and Red Light Tickets Debt Relief Program FAQ's, www.chicago.gov/content/dam/city/depts/fin/supp_info/Revenue/Amnesty_FAQ_Parking_Red_Light.pdf (describing typical $44 in collection costs per ticket); MCC § 9-100-120(g) ($100 immobilization fee).

raises the cost to $1,257. Every cent must be repaid in order to recover the car. *See* MCC § 9-100-120(d).[5]

5.  If the money isn't paid, the City simply keeps the vehicle at which point the City can add it to its own fleet of vehicles for its own use or convert it to cash by auctioning it off or selling it for scrap. *See* MCC § 9-92-100(b)-(d). In the vast majority of cases, the City sells it for scrap, usually for only a couple hundred dollars. *See* Ramos, *Chicago's Towing Program is Broken*, *supra* at n.1.

6.  The City does not compensate an owner in any way when it takes a vehicle in this manner. Even if it sells the vehicle, *none* of the proceeds are paid to the owner. Incredibly, the City does not even off-set the owner's debts by the amount of the sale. It simply takes it all for itself and leaves the former owner's debt as it is.

7.  The end result is devastating: the owner loses a car – usually their most important asset and only mode of transportation to get to work, school, etc. – and is left saddled not only with the existing ticket debt, but also hefty towing and storage fees. Often times, like in the case of Plaintiff Walawski, the owner also has a loan on the vehicle on which he is required to continue to make monthly loan payments even though he no longer has the vehicle.

8.  This basic story, played out thousands of times every year, is unfortunate and unwise. It is also unconstitutional. The act of booting, towing, and selling a vehicle in order to collect a public debt is a taking. Therefore, Plaintiffs, whose cars were taken from them by the City because they owed it ticket debt, bring this suit to obtain the just compensation they are owed under the Constitutions of the United States of America and the State of Illinois.

---

[5] Pursuant to the new legislation, the owner of a vehicle towed after Sept. 18, 2019 may apply for a payment plan. But that just ratchets up the pressure. Failure to make all payments under the plan will result in another tow (with new tow and storage fees) plus an additional $100 fine. *See* MCC § 9-100-160(b)(2) (eff. Sept. 18, 2019).

## PARTIES

9.      Plaintiff Danyetta Walker ("Walker") is an individual who resides in Cook County, Illinois.

10.     Plaintiff Joseph Walawski ("Walawski") is an individual who resides in Cook County, Illinois.

11.     Defendant City of Chicago is an Illinois Municipal Corporation.

12.     Defendant United Road Towing, Inc. ("United Road Towing" or "URT") is a Delaware corporation with its corporate offices located in Mokena, Illinois.  URT provides towing and auto pound management services throughout Chicago on behalf of the City.

## JURISDICTION AND VENUE

13.     This Court has personal jurisdiction over the City because it resides, maintains offices, and does business in this judicial district and because the actions undertaken by the City giving rise to Plaintiffs' claims arose in this district.

14.     This Court has personal jurisdiction over URT because it resides, maintains offices, and does business in this judicial district and because the actions undertaken by URT giving rise to Plaintiffs' claims arose in this district.

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that certain of the claims alleged arise under the Constitution of the United States.  This Court has subject matter jurisdiction over all other claims pursuant to 28 U.S.C. § 1367 in that they are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

16.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because the Defendants reside, maintain offices, and do business in this judicial district and because the events giving rise to Plaintiffs' claims arose in this district.

## FACTUAL ALLEGATIONS

### *The City's Debt Collection Regime*

17.     Every day in Chicago, vehicles are towed because they are abandoned, block the public way, or pose a hazard to the public.  *See, e.g.,* MCC § 9-92-030 (permitting *inter alia* the tow of cars that are abandoned or illegally parked).  Still more vehicles are towed because they were used in the commission of a crime.  *See, e.g.,* MCC § 7-24-225 (drug sale using vehicle); MCC § 7-24-225 (driving while intoxicated).

18.     But the cars in this case were towed for a different reason.  They were towed in order to collect a civil debt.

19.     In Chicago, alleged violations of the City's parking, standing, compliance (*i.e.*, City sticker tickets), automated traffic law (*i.e.*, red-light camera), and automated speed enforcement (*i.e.*, speed camera) ordinances are adjudicated by the City's Department of Administrative Hearings ("DOAH").  *See* MCC § 2-14-140.

20.     If the owner of a vehicle admits to an alleged violation, fails to contest it, or contests and loses, then DOAH enters a "final determination of liability" against the vehicle owner and assesses fines and penalties.  *See* MCC § 9-100-050 (providing that judgments are entered against the vehicle owner rather than the person driving at the time of the alleged offense).

21.     Under the Municipal Code, these fines and penalties "constitute a debt due and owing the city[.]"  MCC § 9-100-100(b).

22.     The City has used its unique status as a government to grant itself a suite of debt collecting powers that that would make the most cynical private debt collector blush.

23.     For example, the City has the power to suspend driver's licenses of persons with unpaid tickets. *See* MCC § 9-100-130.[6]  It can garnish state income tax refunds. *See* 35 ILCS 5/911.3.  The City will also deny, suspend, or revoke business licenses held by persons with unpaid ticket debt. *See* MCC §§ 4-4-084; 4-4-150.  The City also makes extensive use of traditional debt collection agencies and bills its debtors for collection costs and attorney's fees. *See* MCC §§ 1-19-20; 1-19-030.

24.     But the City's most swift and certain debt collection tool is its power to boot, tow, and keep vehicles owned by persons with ticket debt.  Under § 9-100-120 of the Municipal Code, the City has the power to boot, tow, and keep a vehicle whose owner has accumulated three unpaid violations. *See* MCC § 9-100-120(b).  The vehicle may also be taken if just two violations go unpaid for more than a year. *See id*.

25.     Prior to September of 2019, once the boot was applied, the vehicle owner had 24 hours to pay up or the vehicle would be towed. *See* MCC § 9-100-120(c).  On September 20, 2019, the Mayor signed a new ordinance that allows motorists to seek "[a]dditional compliance time, as provided in rules" to avoid the 24-hour tow.  It appears that the only extension available is one additional day. *See supra*, n. 3.  Once the vehicle has been towed, the owner has 31 days to pay the original underlying fines, fees, and collection costs, plus the additional boot fee, tow fee, administrative fees, and storage fees or get on a City-approved payment plan. *See* MCC § 9-100-120(f).  Failing payment, the car is retained by the City and typically sold for scrap.  Even with the

---

[6] A new state law will rein in the City's power to suspend driver's licenses for unpaid parking tickets, but the City will keep its power to suspend licenses for unpaid red-light or speed camera tickets. *See* Pub. Act. 101-0623 (eff. July 1, 2020) (amending 625 ILCS 5/6-306.5).  Nothing in this new legislation, however, prohibits the City's boot, tow, and scrap abuses set forth herein.

new legislation, vehicle owners face the threat of the City's boot, tow, scrap regime. That is because as soon as a debtor misses one payment to the City, the debtor's vehicle is once again eligible to be booted, towed, and permanently confiscated. *See* MCC § 9-100-160(e).

26. The whole purpose of these "unpaid ticket tows" and the permanent dispossession of vehicles that follows is to coerce vehicle owners into paying the debts they owe the City. If they do not pay up, the City keeps their car for its own use or, in most cases, sells it for scrap.

27. The City pretends that its scheme of booting, towing, and scrapping vehicles for unpaid tickets is "for the purpose of enforcing the parking, standing, compliance, automated traffic law enforcement system, or automated speed enforcement system ordinances of the traffic code." *See* MCC § 9-100-120(a). But that is no more than empty rhetoric. In truth, the City's unpaid ticket tows have no law enforcement function.

28. After all, unpaid ticket tows only happen *after* the underlying tickets are fully adjudicated, a "final determination of liability" has been entered, and fines and penalties have been assessed. *See* MCC § 9-100-120(b).

29. In other words, unpaid ticket tows occur only *after* the underlying ordinances have been fully and finally enforced. In the words of the City's own Municipal Code, all that remains after adjudication of these civil violations is a civil "debt due and owing the city[.]" *See* MCC § 9-100-100(b). Collecting on these debts – and ratcheting up the pressure on debtors – is the real purpose of the City's boot, tow, and scrap regime.

30. Tellingly, unpaid ticket tows are administered not by the Department of Streets and Sanitation or the Chicago Police Department, but by the City Comptroller's Department of Finance. *See* MCC §§ 9-100-120 (granting authority to "traffic compliance administrator"); 9-

100-010 (designating comptroller as traffic compliance administrator). That makes perfect sense given that the whole purpose of this scheme is debt collection.

31.     Having no law enforcement function, unpaid ticket tows have no public safety purpose either. The most dangerous drivers will be unaffected by unpaid ticket tows, so long as they pay their tickets on time. Even vehicles ticketed for faulty brakes (MCC § 9-76-010), no headlights (MCC § 9-76-050), or missing rear-view mirrors (MCC § 9-76-120) are safe from the tow truck so long as the City is paid on time.

32.     Just as the City does not discriminate between safe and dangerous drivers, the City does not limit unpaid ticket tows to vehicles that are hazardous, in disrepair, or otherwise dangerous to public safety. Quite the contrary: the City regularly tows and scraps even late-model luxury sedans and sports cars, indiscriminately turning valuable vehicles into hunks of scrap. *See* Ramos, *Chicago's Towing Program is Broken*, *supra* at n.1 (hundreds of BMW, Audi, and Mercedes vehicles sold for scrap in 2017 alone). Indeed, Plaintiff Walawski's vehicle was a 2016 Nissan Sentra that was less than two years old at the time it was towed and disposed of by the City and on which he had an outstanding car loan of over $17,000.

33.     In 2017, the City made it explicit that the purpose of unpaid ticket tows under MCC § 9-100-120 is to collect a public debt, not enforce the law. At that time, the City amended its Municipal Code to state that "[a]ny vehicle immobilized by the City or its designee shall be subject to a possessory lien in favor of the City in the amount required to obtain release of the vehicle." *See* MCC § 9-100-120(j).

8

34.     The reason for the change was simple: so many Chicagoans were going bankrupt from ticket debt that – due to the automatic stay on debt collection that comes with declaring bankruptcy – the City was frequently forced to release impounded vehicles before it could collect.[7]

35.     By enforcing liens on towed vehicles, the City reasoned, it would avoid the automatic stay and keep cars until their owners paid up – bankruptcy or not.  Indeed, the City publicly declared that the amendment would close the bankruptcy "loophole" and stop the "growing practice of individuals attempting to escape financial liability" and "avoid paying monies due to the City[.]"  Amend. Coun. J. June 28, 2017, p. 51164-51165.  In other words, the change would allow the City to go on using unpaid ticket tows as a tool to coerce debtors into repayment.  No mention was made of public safety or law enforcement.  *See generally id*.

36.     In sum, the City's program of booting, towing, and scrapping cars for unpaid ticket debt has no law enforcement function or public safety goal.  Rather, the entire scheme twists the City's police powers into tools to further its own financial interests.

37.     Vehicle owners who can not afford the City's exorbitant fines, penalties, and towing charges lose more than their car: they lose the ability to drive to work, school, medical appointments, and religious services.  That is especially true for Chicagoans who live in neighborhoods that are not well served by public transit.

38.     With its many powers not available to private creditors, the City is a collections juggernaut.  The City collected an estimated $345 million in fines and penalties in 2018 alone.  *See*

---

[7] *See* Melissa Sanchez and Sandhya Kambhampati, *How Chicago Ticket Debt Sends Black Motorists Into Bankruptcy*, PROPUBLICA (Feb. 27, 2018), http://features.propublica.org/driven-into-debt/chicago-ticket-debt-bankruptcy/ (reporting owners of towed cars declaring bankruptcy to, in part, get their cars back); *see also* Paul Kiel and Hanna Fresques, *Chicago's Bankruptcy Boom*, PROPUBLICA (Sept. 28, 2017), http://www.propublica.org/article/chicagos-bankruptcy-boom (showing increase in bankruptcies due to Chicago ticket debt); *see also* Paul Kiel and Hanna Fresques, *Data Analysis: Bankruptcy and Race in America*, PROPUBLICA (Sept. 27, 2017), http://projects.propublica.org/graphics/bankruptcy-data-analysis ("we found large amounts of traffic-related debt, mainly owed to the City of Chicago").

City of Chicago, 2019 Budget Overview 29 (2018). That amount constitutes a full 9 percent of the City's operating revenue. *See id.* The City's revenue from the sale of scrapped vehicles is a meaningful part of that total. In 2017 alone, the City made $4,072,339.51 by selling towed cars for scrap. *See* Ramos, *Takeaways From Our Investigation Into Chicago's Broken Towing Program*, *supra* at n.2. Adding revenue from boot and storage fees raises that total by at least $10 million more. *See id.* All of this money was deposited into the City's "Corporate Fund" and used to fund the City's ongoing expenses.

### *Takings and the Police Power*

39.     It is one thing for the City to tow and scrap a broken-down car left in the road. Like tearing down an old building that has become a fire hazard, the City is permitted to seize and even destroy property in the interest of public safety. These kinds of property seizures are not considered constitutional takings. Instead, they are said to be exercises of the police power.

40.     "Nowadays, insofar as the expression is used in constitutional law, the phrase 'police power' normally refers to the authority of the states for the promotion of public health, public safety, public morals, and public welfare." Santiago Legarre, *The Historical Background of the Police Power*, 9 U. PA. J. CONST. L. 745, 794 (2007); *see also Ass'n of Home Appliance Manufacturers v. City of New York*, 36 F. Supp. 3d 366, 372 (S.D.N.Y. 2014) ("To be a valid exercise of police power, a municipal legislative act must bear a reasonable relationship to a legitimate purpose within the City's police powers – e.g., the promotion of the health, safety, well-being or welfare of the community.").

41.     Being fundamentally a matter public policy, the police power is not a green light for municipalities to enforce debts with the threat of property seizure. A municipality might be permitted to seize property in order to satisfy a debt, but the municipality must still reduce or "set

10

off" the debt by the value of the property seized.[8]  But the City does not do that: it simply keeps everything for itself.

42.     Not coincidentally, the Seventh Circuit recently found that the City's boot, tow, scrap regime is more about collecting on a public debt than safety concerns.  In *In re Fulton*, the Seventh Circuit Court of Appeals heard an appeal from the bankruptcy court related to the City's "possessory lien" program described *supra* at ¶¶ 33-35.  *See In re Fulton*, 926 F.3d 916 (7th Cir. 2019).  The case concerned the City's refusal to release vehicles seized for unpaid ticket debt when a bankruptcy automatic stay required that release.  *See id*. at 920.  The City justified its refusal, in part, on the police power.  The Seventh Circuit disagreed:

> We are persuaded that, on balance, this is an exercise of revenue collection more than police power.  As debtors observe, a not insignificant portion of the City's annual operating fund comes from its collection of parking and traffic tickets.  Moreover, the kind of violations the City enforces are not traditional police power regulations; these fines are for parking tickets, failure to display a City tax sticker, and minor moving violations.  Even tickets for a suspended license, a seemingly more serious offense, are often the result of unpaid parking tickets and are thus not related to public safety.  And the City impounds vehicles regardless of what violations the owner has accrued, without distinguishing between more serious violations that could affect public safety versus the mere failure to pay for parking.  Most notably, the City imposes the monetary penalty on the owner of the vehicle, not the driver, which signals a seeming disconnect if the City actually has safety concerns about the offending driver.  As the ordinance amending M.C.C. § 9-100-120 demonstrates, the City's focus is on the financial liability of vehicle owners, not on public safety.

---

[8]Indeed, the Illinois Vehicle Code provides:

> With respect to any vehicle that has been booted, impounded, or both in accordance with subsection (c) of Section 11-208.3, a city with a population over 500,000 may establish a program whereby the registered owner, lienholder, or other legally entitled person is entitled to any proceeds from the disposition of the vehicle, less any reasonable storage charges, administrative fees, booting fees, towing fees, and parking and compliance fines and penalties.

625 ILCS 5/4-208.  Despite the Illinois General Assembly's acknowledgment that an owner should be afforded compensation when the government confiscates his or her vehicle to satisfy ticket debt, the City never adopted an ordinance or program entitling such compensation to the owner.

*Id.* at 929 – 930 (internal citation omitted); *see also In re Shannon*, 590 B.R. 467, 492 (Bankr. N.D. Ill. 2018), *aff'd sub nom. In re Fulton*, 926 F.3d 916 (7th Cir. 2019) ("Actions by governments to collect debts generally do not fall within the police power….").

43.     In other words, taking and selling a person's car simply because they owe ticket debt bears no "reasonable relationship to a legitimate purpose within the City's police powers – e.g., the promotion of the health, safety, well-being or welfare of the community." *See Ass'n of Home Appliance Manufacturers*, 36 F. Supp. 3d at 372. It is just the act of a debt collector dressed up as a municipality. It is the very definition of an unconstitutional taking.

### *The City's Failure to Provide Proper Notice Prior to Disposal*

44.     The City's towing program is not just unconstitutional. It also fails to comply with state law. Incredibly, the City does not even follow its *own municipal code* for providing motorists with notice that their vehicles have been towed.

45.     In 2005, the Illinois legislature amended Section 4-208 of the Illinois Vehicle Code to require municipalities having a population of more than 500,000 to provide owners of vehicles that have been towed and impounded an additional and subsequent notice warning them that their vehicles may be disposed of if they are not reclaimed. *See* 625 ILCS 5/4-208; *see also* 2005 Ill. Legis. Serv. P.A. 94-650 (S.B. 501). This notice is in addition to the initial notice advising individuals that that their vehicle has been impounded. *Id.*

46.     This amendment was brought about as a result of towing abuses in the City of Chicago. *See* Illinois House Transcript, 2005 Reg. Sess. No. 60 (referencing "unscrupulous towing companies", noting that the "Bill now only appl[ies] to the City of Chicago", and that "what it first does is gives a second notice to these cars that have been towed and changes the dates from 15 to 18") (comments of Representatives Parke and Rita).

12

47.     Indeed, the law was specifically aimed at the City of Chicago.  *See* Illinois Senate Transcript, 2005 Reg. Sess. No. 29 ("We want to address the towing situation in the City of Chicago to make it easier for someone who's had their car towed, for whatever reason….") (comments of Senator Hendon).  The General Assembly made clear that:

> [W]hatever's established is not established under the basis of simply putting more money into the coffers of the City of Chicago budget but is compassionate towards the citizens of Chicago….

Illinois House Transcript, 2005 Reg. Sess. No. 60 (comments of Representative Parke); *see also id.* ("It sets up a program for the City of Chicago.  It mandates them to set up a program, give second notices to cars that have been relocated.") (comments of Representative Rita).

48.     Unfortunately, this law did not stop the abuses.  In fact, as noted above, the City towed 93,857 vehicles in 2017 alone, of which 32,155 remained unclaimed.  *See* Ramos, *Takeaways From Our Investigation Into Chicago's Broken Towing Program*, *supra* at n.2.

49.     The root of this problem can be traced in large part to the fact that, despite the General Assembly amending the Illinois Vehicle Code in 2005 (effective January 1, 2016) to afford greater protections for Chicago residents, the City failed to amend its own Municipal Code to bring it into compliance with that law.

50.     In fact, for more than a decade after the General Assembly amended Section 4-208 of the Illinois Vehicle Code, Section 9-92-100 of the Municipal Code continued to track the pre-2006 version of that law.  It was not until November 16, 2016, that the Municipal Code was amended to include the protections the General Assembly mandated more than a decade earlier:

> Whenever an abandoned, lost, stolen, or other impounded motor vehicle, or a vehicle determined to be a hazardous dilapidated motor vehicle pursuant to Section 11-40-3.1 of the Illinois Municipal Code, remains unclaimed by the registered owner, lienholder or other person legally entitled to possession for a period of ~~15~~ 18 days after notice has been given pursuant to Section 9-92-070 (a) or (b), if, during that 18-day period, the department of police or department of streets and sanitation has sent an additional notice by first class mail to the registered owner,

13

lienholder, or other legally entitled person, the superintendent of police or ~~the~~ commissioner of streets and sanitation shall authorize the disposal or other disposition of such unclaimed vehicles….

Coun. J. Nov. 16, 2016 at 38010; *see also* MCC § 9-92-100.

51.     Thus, as of November 16, 2016, the Municipal Code requires a staggered notice regime that serves two different purposes prior to the disposal of a vehicle. The first requirement is found in MCC § 9-92-070, entitled "Notice to owner of impounded vehicle," which directs the City to send an initial notice advising an owner that her vehicle has been towed and impounded. MCC § 9-92-070 (requiring the City to send a "notice of the impoundment" within ten days of the tow). The second requirement is found in MCC § 9-92-100, entitled "Disposal of unclaimed vehicles," which directs the City to send a subsequent notice of impending disposal if the vehicle remains unclaimed after the first notice is issued. MCC § 9-92-100(a) (requiring "additional notice" within 18 days after the first notice).

52.     Despite this belated change to the Municipal Code, which applies to all vehicles regardless of age, the City still fails to provide motorists the required notice of impending vehicle disposal as required by MCC § 9-92-100. In other words, the City is disposing of citizens' vehicles without telling them and then keeping the proceeds of the sale.

53.     This is not an isolated incident, but rather is standard operating procedure by the City. Specifically, the City's issuance of such notices is done through an automated system. The City's internal processes provide only for the issuance of a post-tow "notice of vehicle impoundment" pursuant to MCC § 9-92-070 (by both regular and certified mail for vehicles seven years of age or newer and by regular mail only for vehicles that are older than seven years of age), but does not provide for the issuance of the subsequent additional notice of impending vehicle

disposal as required by MCC § 9-92-100. Thus, as a matter of practice, the City does not provide the notice required by MCC § 9-92-100 prior to disposing of a vehicle.

### *United Road Towing*

54. This entire scheme could not work, of course, without the entity that actually tows the vehicles: United Road Towing, "a private towing contractor long-tainted by scandals" that has handled towing operations in Chicago for the past 30 years. Ramos, *Chicago's Towing Program Is Broken*, *supra* at n.1 (citing a number of scandals including, but not limited to, United Road Towing "bilk[ing] the city for $1 million" and an FBI probe into "an interstate auto-theft ring"). Despite its checkered past, in 2016 the City gave United Road Towing a $60 Million contract over five years to handle such work.

55. In addition to the City paying United Road Towing a fee for each tow, if an owner cannot afford to get his or her vehicle out of the pound or if it otherwise remains unclaimed, the City will also sell the vehicle to United Road Towing at scrap value, which is usually less than $200. In other words, at nominal cost, United Road Towing can take possession of the vehicles it tows for the City even if they are worth thousands of dollars more than what it paid. *See* Ramos, *Chicago's Towing Program Is Broken*, *supra* at n.2 ("Chicago has long known that [if] it tows enough cars that it can pay the towing company with some of them, potentially lowering overall towing costs for the city.") (noting that in 2017 alone the City's tow contractor paid $4 Million to take possession of 24,000 towed vehicles that had a value of more than $22 Million).

56. Thus, this entire regime – from the initial tow to the ultimate disposal of vehicles – is carried out by United Road Towing at the behest of the City.

### *The Taking of Plaintiffs' Vehicles*

57.     On February 27, 2019, the City towed and impounded Plaintiff Walker's vehicle, a 2000 Chrysler Concorde, pursuant to MCC § 9-100-120.  The tow was handled and processed by United Road Towing on behalf of the City.  The City thereafter disposed of Plaintiff Walker's vehicle not by selling it for fair market value, but rather by selling it at scrap value to United Road Towing.  The City did not provide any compensation to Plaintiff Walker for the taking of her vehicle, nor does it offer vehicle owners like her a hearing to determine fair compensation for the taking of a vehicle pursuant to MCC § 9-100-120.

58.     The City claims that it mailed Plaintiff Walker a post-tow "notice of vehicle impoundment" on or about March 1, 2019, pursuant to MCC § 9-92-070.  The City, however, never mailed Plaintiff Walker the subsequent additional notice of impending vehicle disposal as required by MCC § 9-92-100.  Walker has since obtained a new vehicle, but continues to have unpaid ticket debt on at least three violations.

59.     On May 19, 2018, the City towed and impounded Plaintiff Walawski's vehicle, a 2016 Nissan Sentra, pursuant to MCC § 9-100-120.  The tow was handled and processed by United Road Towing on behalf of the City.  The City thereafter disposed of Plaintiff Walawski's vehicle not by selling it for fair market value, but rather by selling it at scrap value to United Road Towing. In fact, even though Plaintiff Walawski's vehicle was relatively new and in excellent condition, the City sold the vehicle to United Road Towing for a mere $204.48.  The City did not provide any compensation to Plaintiff Walawski for the taking of his vehicle, nor does it offer vehicle owners like him a hearing to determine fair compensation for the taking of a vehicle pursuant to MCC § 9-100-120.

60.    The City claims that it mailed Plaintiff Walawski a post-tow "notice of vehicle impoundment" on or about May 23, 2018 by regular and certified mail, pursuant to MCC § 9-92-070.  The City, however, never mailed Plaintiff the subsequent additional notice of impending vehicle disposal as required by MCC § 9-92-100.

61.    Plaintiff Walawski had a loan on his vehicle with PNC Bank.  Since his vehicle was taken from him by the City, PNC Bank has sought to collect over $17,000 in connection with that loan.  In other words, Plaintiff Walawski not only lost his vehicle, which he used to earn a living as a delivery driver, but is also on the hook for over $17,000 in payments for a vehicle he no longer owns.  To make matters worse, the City has placed holds on business licenses sought by Plaintiff Walawski due to outstanding ticket debt.  Thus, the City has taken Plaintiff Walawski's vehicle, depriving him of his then-existing livelihood, and has since taken active steps to further deprive him of employment opportunities, all for the unforgivable sin of failing to pay a ticket.

## CLASS ALLEGATIONS

62.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Procedure on behalf of a class of similarly situated individuals defined as follows:

> All vehicle owners who had their vehicle impounded and disposed of by the City of Chicago pursuant to MCC § 9-100-120 (the "Class").

63.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Procedure on behalf of an additional class of similarly situated individuals defined as follows:

> All vehicle owners who had their vehicle towed by or through the Department of Streets and Sanitation pursuant to Chapter 9-92 of the Municipal Code of Chicago that were disposed of by the City (the "Notice Class").

64.    The number of class members is so large that joinder of all members is impracticable.  As noted above, in 2017 alone the City towed 19,665 vehicles for unpaid ticket

17

debt. *See* Ramos, *Chicago's Towing Program is Broken*, *supra* at n.2. The exact number of class members can be determined from records maintained by Defendants.

65.    Plaintiffs' claims are typical of the claims of other class members as they were all similarly affected by Defendants' wrongful conduct as alleged herein

66.    Common questions exist as to the Class that will predominate over questions, if any, that solely affect individual class members. These common questions include:

a.    Whether the procedures set forth in MCC § 9-100-120 authorizing the taking of vehicles for unpaid ticket debt without providing the vehicle owner with fair compensation, or even a hearing to determine fair compensation, violates the Takings Clause of the United States and Illinois Constitutions.

b.    Whether URT acts under color of state law when it tows and takes possession of vehicles for unpaid ticket debt pursuant to MCC § 9-100-120.

c.    Whether Plaintiffs and class members are entitled to an injunction preventing the City and URT from taking vehicles for unpaid ticket debt without providing the vehicle owner with fair compensation or a hearing to determine fair compensation.

d.    Whether it was unjust for the City to retain payment for the sale of vehicles and/or any fines, penalties, and other amounts it received in connection with the towing and disposal of vehicles pursuant to an ordinance that is unconstitutional.

e.    Whether it was unjust for URT to retain payment for the sale or resale of vehicles that were towed and disposed of pursuant to an ordinance that is unconstitutional.

67.    Common questions exist as to the Notice Class that will predominate over questions, if any, that solely affect individual class members. These common questions include:

a.    Whether the City acted unlawfully and without legal authorization when it disposed of vehicles without sending the required subsequent notice of impending vehicle disposal as required by MCC § 9-92-100.

b.    Whether Plaintiffs and class members are entitled to an injunction preventing the City from disposing of unclaimed vehicles without sending the subsequent notice of impending vehicle disposal as required by MCC § 9-92-100.

c.      Whether it was unjust for the City to retain payment for the sale of vehicles or other amounts it received when it disposed of them illegally and in violation of MCC § 9-92-100.

d.      Whether it was unjust for URT to retain payment for the sale or resale of vehicles that were disposed of illegally and in violation of MCC § 9-92-100.

e.      Whether Plaintiff and class members are entitled to an order of mandamus requiring the City to send the subsequent notice of impending vehicle disposal as required by MCC § 9-92-100.

f.      Whether the City's practice of disposing of vehicles without sending the required subsequent notice of impending vehicle disposal as required by MCC § 9-92-100 resulted in the taking of property without just compensation in violation of the United States and Illinois Constitutions.

g.      Whether the City's practice of disposing of vehicles without sending the required subsequent notice of impending vehicle disposal as required by MCC § 9-92-100 resulted in an unreasonable seizure in violation of the United States and Illinois Constitutions.

68.     Plaintiffs will fairly and adequately protect the interests of members of the class. Plaintiffs have retained competent counsel experienced in class action litigation in state and federal courts. Plaintiffs have no interest adverse to any class members. Plaintiffs intend to prosecute this case vigorously on behalf of themselves and the class members.

69.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy because it involves (i) the legality of an ordinance that applies equally to Plaintiffs and all members of the Class, and (ii) the City's practice of failing to send a required notice that applies equally to Plaintiffs and all members of the Notice Class. Litigating individual class members' claims would produce a multiplicity of cases, congesting the judicial system, and creating the potential for inconsistent or contradictory judgments. Class treatment, by contrast, provides manageable judicial treatment calculated to bring a rapid conclusion to the

litigation of all claims arising from Defendants' misconduct. Class certification, therefore, is appropriate under Rule 23(b)(3).

70.     Class certification is also appropriate under Rule 23(b)(2) because Defendants have acted, or refused to act, on grounds generally applicable to class members, thereby making final injunctive relief or corresponding declaratory relief appropriate for the class.

**COUNT I**
**<u>Declaratory and Injunctive Relief – Taking Without Just Compensation</u>**
**(on behalf of the Class against Defendants City of Chicago and United Road Towing)**

71.     Plaintiffs adopt and incorporate by reference all prior paragraphs as if fully set forth herein.

72.     The United States Constitution provide that private property shall not be taken for public use without just compensation. *See* U.S. CONST. amend. V. The Illinois Constitution similarly provides that private property shall not be taken or damaged for public use without just compensation. *See* ILL. CONST. art. I, § 15.

73.     As set forth above, MCC § 9-100-120 provides for the taking of citizen's vehicles for public use without providing any compensation to the owner or even a hearing to determine fair compensation. While confiscation of property will not be considered a taking if the confiscation is a lawful exercise of that government's police powers, the impoundment and disposal of vehicles for unpaid ticket debt is not an exercise of police power. *See In re Fulton*, 926 F.3d 916 (7th Cir. 2019).

74.     Plaintiffs' vehicles were taken from them and disposed of by the City without compensation pursuant to MCC § 9-100-120.

75.     Accordingly, MCC § 9-100-120, on its face, violates the Takings Clause of the United States and Illinois Constitutions.

**WHEREFORE**, Plaintiffs pray that the Court:

A.      Certify this case as a class action, designate Plaintiffs as class representatives and appoint Plaintiffs' counsel as class counsel;

B.      Declare that the provisions of MCC § 9-100-120 authorizing the taking of vehicles without compensation or even a hearing to determine fair compensation violates the Takings Clause of the United States and Illinois Constitutions and is therefore void *ab initio*;

C.      Grant preliminary and permanent injunctive relief preventing the City and URT from towing, impounding, and disposing of vehicles pursuant to MCC § 9-100-120;

D.      Award Plaintiffs and members of the Class restitution in an amount to be determined herein, including pre- and post-judgment interest;

E.      Grant an award of reasonable attorneys' fees and all expenses and costs of this action; and

F.      Order such other and further relief as this Court deems equitable, just and proper.

## COUNT II
### 42 U.S.C. § 1983 – Taking Without Just Compensation
**(on behalf of the Class against Defendants City of Chicago and United Road Towing)**

76.     Plaintiffs adopt and incorporate by reference all prior paragraphs as if fully set forth herein.

77.     The City's tow, impound, and disposal of vehicles without just compensation is its well-settled custom or practice, which was ratified by policymakers for the City with final policymaking authority.  Indeed, the unconstitutional actions alleged herein were taken in connection with the implementation and enforcement of MCC § 9-100-120, an ordinance adopted by its City Council.  Thus, the conduct being challenged herein is the official policy of the City.

21

Therefore, all City employees and agents were acting under color of law in carrying out this policy, custom, or practice.

78.    URT was also acting under color of state law because its actions set forth herein are done at the behest of the City and pursuant to an ordinance designed to accomplish the City's purpose of collecting a public debt.

79.    As a result of this policy, custom, or practice, the taking of Plaintiffs' vehicles, as well as the taking of the vehicles of all members of the Class, was unconstitutional.

80.    The misconduct described herein was objectively unreasonable and undertaken intentionally with deliberate indifference to the constitutional rights of Plaintiffs and members of the Class.  Alternatively, the misconduct described herein was undertaken intentionally, with malice, and/or with reckless indifference to the constitutional rights of Plaintiffs and members of the Class.

81.    As a result of this policy, custom, or practice, the City and URT deprived Plaintiffs and members of the Class of their constitutional rights to be free from having their property taken without just compensation.  As a direct and proximate cause of this deprivation of constitutional rights, Plaintiffs and members of the Class suffered the loss of their vehicles and other damages.

**WHEREFORE**, Plaintiffs pray that the Court:

A.    Certify this case as a class action, designate Plaintiffs as class representatives and appoint Plaintiffs' counsel as class counsel;

B.    Award Plaintiffs and members of the Class restitution and damages in an amount to be determined herein, including pre- and post-judgment interest;

C.    Grant an award of reasonable attorneys' fees and all expenses and costs of this action; and

D.    Order such other and further relief as this Court deems equitable, just and proper.

## COUNT III
## <u>Unjust Enrichment</u>
### (on behalf of the Class against Defendant City of Chicago)

82.    Plaintiffs adopt and incorporate by reference all prior paragraphs as if fully set forth herein.

83.    The City has received payment for the sale of vehicles, as well as for fines, penalties, and other amounts, in connection with the taking of vehicles pursuant to MCC § 9-100-120.  As set forth herein, this was illegal and unconstitutional.

84.    Thus, the City has collected funds to which it was not entitled.  The City knowingly appreciated and accepted this benefit, which has resulted and continues to result in an inequity to Plaintiffs and members of the Class.

85.    The City has thus unjustly received and retained a benefit belonging to Plaintiffs and members of the Class, who have therefore suffered a commensurate detriment.

86.    The City's retention of this benefit violates the fundamental principles of justice, equity, and good conscience.

**WHEREFORE**, Plaintiffs pray that the Court:

A.    Certify this case as a class action, designate Plaintiffs as class representatives and appoint Plaintiffs' counsel as class counsel;

B.    Award Plaintiffs and members of the Class restitution in an amount to be determined herein, including pre- and post-judgment interest;

C.    Grant an award of reasonable attorneys' fees and all expenses and costs of this action; and

D.    Order such other and further relief as this Court deems equitable, just and proper.

**COUNT IV**
**Unjust Enrichment**
**(on behalf of the Class against Defendant United Road Towing)**

87.     Plaintiffs adopt and incorporate by reference all prior paragraphs as if fully set forth herein.

88.     URT has received payment for the sale or resale of vehicles that were towed and disposed of pursuant to an ordinance that is unconstitutional.

89.     Thus, URT has collected funds to which it was not entitled. URT knowingly appreciated and accepted this benefit, which has resulted and continues to result in an inequity to Plaintiffs and members of the Class.

90.     URT has thus unjustly received and retained a benefit belonging to Plaintiffs and members of the Class, who have therefore suffered a commensurate detriment.

91.     URT's retention of this benefit violates the fundamental principles of justice, equity, and good conscience.

**WHEREFORE**, Plaintiffs pray that the Court:

A.     Certify this case as a class action, designate Plaintiffs as class representatives and appoint Plaintiffs' counsel as class counsel;

B.     Award Plaintiffs and members of the Class restitution in an amount to be determined herein, including pre- and post-judgment interest;

C.     Grant an award of reasonable attorneys' fees and all expenses and costs of this action; and

D.     Order such other and further relief as this Court deems equitable, just and proper.

**COUNT V**
**Declaratory and Injunctive Relief**
**(on behalf of the Notice Class against Defendants**
**City of Chicago and United Road Towing)**

92.    Plaintiffs adopt and incorporate by reference all prior paragraphs as if fully set forth herein.

93.    Plaintiffs seek a judgment declaring that the City and URT acted unlawfully and without legal authorization when they disposed of vehicles pursuant to Chapter 92 of the MCC without the required subsequent notice of impending vehicle disposal being sent to the vehicle owner as required by MCC § 9-92-100.

94.    Plaintiffs have a personal claim which is capable of being affected.  As detailed above, this case presents an actual controversy that requires an immediate and definitive determination of the parties' rights.

**WHEREFORE**, Plaintiffs pray that the Court:

A.    Certify this case as a class action, designate Plaintiffs as class representatives and appoint Plaintiffs' counsel as class counsel;

B.    Declare that the City and URT acted unlawfully and without legal authorization when it disposed of vehicles pursuant to Chapter 92 of the MCC without sending the required subsequent notice of impending vehicle disposal as required by MCC § 9-92-100;

C.    Grant preliminary and permanent injunctive relief preventing the City and URT from disposing of unclaimed vehicles without sending the subsequent notice of impending vehicle disposal as required by MCC § 9-92-100;

D.    Award Plaintiffs and members of the Notice Class restitution in an amount to be determined herein, including pre- and post-judgment interest;

E.  Grant an award of reasonable attorneys' fees and all expenses and costs of this action; and

F.  Order such other and further relief as this Court deems equitable, just and proper.

**COUNT VI**
**Unjust Enrichment**
**(on behalf of the Notice Class against Defendant City of Chicago)**

95.  Plaintiffs adopt and incorporate by reference all prior paragraphs as if fully set forth herein.

96.  The City has received payment for the sale of vehicles and/or other amounts in connection with the disposal of unclaimed vehicles without sending the subsequent notice of impending vehicle disposal as required by MCC § 9-92-100.  As set forth herein, this was illegal and unconstitutional.

97.  Thus, the City has collected funds to which it was not entitled.  The City knowingly appreciated and accepted this benefit, which has resulted and continues to result in an inequity to Plaintiff and members of the Notice Class.

98.  The City has thus unjustly received and retained a benefit belonging to Plaintiffs and members of the Notice Class, who have therefore suffered a commensurate detriment.

99.  The City's retention of this benefit violates the fundamental principles of justice, equity, and good conscience.

**WHEREFORE**, Plaintiffs pray that the Court:

A.  Certify this case as a class action, designate Plaintiffs as class representatives and appoint Plaintiffs' counsel as class counsel;

B.  Award Plaintiffs and members of the Notice Class restitution in an amount to be determined herein, including pre- and post-judgment interest;

26

C.    Grant an award of reasonable attorneys' fees and all expenses and costs of this

action; and

D.    Order such other and further relief as this Court deems equitable, just and proper.

**COUNT VII**
**Unjust Enrichment**
**(on behalf of the Notice Class against Defendant United Road Towing)**

100.    Plaintiffs adopt and incorporate by reference all prior paragraphs as if fully set forth

herein.

101.    URT has received payment for the sale or resale of vehicles that were towed and

disposed of where the vehicle owner was not sent the subsequent notice of impending vehicle

disposal as required by MCC § 9-92-100.  As set forth herein, this was illegal and unconstitutional.

102.    Thus, URT has collected funds to which it was not entitled.  URT knowingly

appreciated and accepted this benefit, which has resulted and continues to result in an inequity to

Plaintiffs and members of the Notice Class.

103.    URT has thus unjustly received and retained a benefit belonging to Plaintiffs and

members of the Notice Class, who have therefore suffered a commensurate detriment.

104.    URT's retention of this benefit violates the fundamental principles of justice,

equity, and good conscience.

**WHEREFORE**, Plaintiffs pray that the Court:

A.    Certify this case as a class action, designate Plaintiffs as class representatives and

appoint Plaintiffs' counsel as class counsel;

B.    Award Plaintiffs and members of the Notice Class restitution in an amount to be

determined herein, including pre- and post-judgment interest;

C.    Grant an award of reasonable attorneys' fees and all expenses and costs of this

action; and

D.  Order such other and further relief as this Court deems equitable, just and proper.

## COUNT VIII
### Mandamus on Behalf of the Notice Class
### (on behalf of the Notice Class against Defendant City of Chicago)

105.  Plaintiffs adopt and incorporate by reference all prior paragraphs as if fully set forth herein.

106.  MCC § 9-92-100 imposes a specific requirement on the City to send an additional, subsequent notice of impending vehicle disposal prior to disposing of a vehicle towed and impounded pursuant to Chapter 9-92 of the MCC.  As set forth above, the City fails to follow this law in contravention of their statutory responsibilities.

**WHEREFORE**, Plaintiffs pray that the Court:

A.  Certify this case as a class action, designate Plaintiffs as class representatives and appoint Plaintiffs' counsel as class counsel;

B.  Enter a writ of mandamus directing the City to send an additional, subsequent notice of impending vehicle disposal prior to disposing of a vehicle towed and impounded pursuant to Chapter 9-92 of the MCC;

C.  Grant an award of reasonable attorneys' fees and all expenses and costs of this action; and

D.  Order such other and further relief as this Court deems equitable, just and proper.

## COUNT IX
### Declaratory and Injunctive Relief – Taking Without Just Compensation
### (on behalf of the Notice Class against Defendants
### City of Chicago and United Road Towing)

107.  Plaintiffs adopt and incorporate by reference all prior paragraphs as if fully set forth herein.

108.    The United States Constitution provide that private property shall not be taken for public use without just compensation.  *See* U.S. CONST. amend. V.   The Illinois Constitution similarly provides that private property shall not be taken or damaged for public use without just compensation.  *See* ILL. CONST. art. I, § 15.

109.    Confiscation of property by a unit of government will not be considered a taking if the confiscation is a lawful exercise of that government's police powers. *See, e.g. Bennis v. Michigan*, 516 U.S. 442, 452 (1996) (compensation may not be required if property lawfully acquired via means other than eminent domain).

110.    Plaintiffs' vehicles were not lawfully acquired.  Instead, the City willfully flouted the requirements of the MCC that control the disposal of impounded vehicles.

111.    Because of the City's willful failure, it was not lawfully authorized to dispose of Plaintiffs' vehicles.  Nevertheless, the vehicles were sold and destroyed.

112.    These actions by the City constituted an illegal and unconstitutional taking.

**WHEREFORE**, Plaintiffs pray that the Court:

A.    Certify this case as a class action, designate Plaintiffs as class representatives and appoint Plaintiffs' counsel as class counsel;

B.    Declare that the City's and URT's practice of unlawfully disposing of vehicles without providing proper notice as required by MCC § 9-92-100 constitutes an unlawful taking under the United States and Illinois Constitutions;

C.    Grant preliminary and permanent injunctive relief preventing the City and URT from disposing of unclaimed vehicles without sending the additional notice of impending vehicle disposal as required by MCC § 9-92-100;

D.    Award Plaintiff and members of the Notice Class restitution in an amount to be

determined herein, including pre- and post-judgment interest;

E.      Grant an award of reasonable attorneys' fees and all expenses and costs of this action; and

F.      Order such other and further relief as this Court deems equitable, just and proper.

**COUNT X**
**42 U.S.C. § 1983 – Taking Without Just Compensation**
**(on behalf of the Notice Class against Defendants**
**City of Chicago and United Road Towing)**

113.    Plaintiffs adopt and incorporate by reference all prior paragraphs as if fully set forth herein.

114.    The City's failure to send the required subsequent notice of impending vehicle disposal as required by MCC § 9-92-100 prior to disposing of unclaimed vehicles is the official policy of the City's Department of Streets and Sanitation and/or its well-settled custom or practice, which was ratified by policymakers for the City with final policymaking authority. Therefore, all City employees and agents were acting under color of law in carrying out this policy, custom, or practice.

115.    URT was also acting under color of state law because its actions set forth herein are done at the behest of the City.

116.    As a result of this policy, custom, or practice, the disposal of Plaintiffs' vehicles, as well as the disposal of the vehicles of all members of the Notice Class, was unlawful and undertaken without any legal authorization.

117.    The misconduct described herein was objectively unreasonable and undertaken intentionally with deliberate indifference to the constitutional rights of Plaintiff and members of the Notice Class. Alternatively, the misconduct described herein was undertaken intentionally, with malice, and/or with reckless indifference to the constitutional rights of Plaintiffs and members

of the Notice Class.

118.    As a result of this policy, custom, or practice, the City and URT deprived Plaintiffs and members of the Notice Class of their constitutional rights to be free from having their property taken without just compensation.   As a direct and proximate cause of this deprivation of constitutional rights, Plaintiffs and members of the Notice Class suffered the loss of their vehicles and other damages.

**WHEREFORE**, Plaintiff prays that the Court:

A.      Certify this case as a class action, designate Plaintiffs as class representatives and appoint Plaintiffs' counsel as class counsel;

B.      Award Plaintiffs and members of the Notice Class restitution and damages in an amount to be determined herein, including pre- and post-judgment interest;

C.      Grant an award of reasonable attorneys' fees and all expenses and costs of this action; and

D.      Order such other and further relief as this Court deems equitable, just and proper.

**COUNT XI**
**Declaratory and Injunctive Relief – Unreasonable Seizure**
**(on behalf of the Notice Class against Defendants**
**City of Chicago and United Road Towing)**

119.    Plaintiffs adopt and incorporate by reference all prior paragraphs as if fully set forth herein.

120.    The United States and Illinois Constitutions provide that people shall be free from unreasonable seizures.  *See* U.S. CONST. amend. IV; ILL. CONST. art. I, § 6.

121.    The disposal of Plaintiffs' vehicles was an unreasonable seizure because the City willfully flouted the requirements of the MCC that control the disposal of impounded vehicles.

122.    Because of the City's willful failure, it was not lawfully authorized to dispose of the vehicle.  Nevertheless, the vehicle was sold and destroyed.

123.    These actions by the City constituted an unreasonable seizure.

**WHEREFORE**, Plaintiffs pray that the Court:

A.    Certify this case as a class action, designate Plaintiffs as class representative and appoint Plaintiffs' counsel as class counsel;

B.    Declare that the City's and URT's practice of unlawfully disposing of vehicles without providing proper notice as required by MCC § 9-92-100 constitutes an unreasonable seizure in violation of the United States and Illinois Constitutions;

C.    Grant preliminary and permanent injunctive relief preventing the City and URT from disposing of unclaimed vehicles without sending the additional notice of impending vehicle disposal as required by MCC § 9-92-100;

D.    Award Plaintiffs and members of the Notice Class restitution in an amount to be determined herein, including pre- and post-judgment interest;

E.    Grant an award of reasonable attorneys' fees and all expenses and costs of this action; and

F.    Order such other and further relief as this Court deems equitable, just and proper.

**COUNT XII**
**42 U.S.C. § 1983 – Unreasonable Seizure**
**(on behalf of the Notice Class against Defendants**
**City of Chicago and United Road Towing)**

124.    Plaintiffs adopt and incorporate by reference all prior paragraphs as if fully set forth herein.

125.    The City's failure to send the required additional notice of impending vehicle disposal as required by MCC § 9-92-100 prior to disposing of unclaimed vehicles is the official

policy of the City's Department of Streets and Sanitation and/or its well-settled custom or practice, which was ratified by policymakers for the City with final policymaking authority. Therefore, all City employees and agents were acting under color of law in carrying out this policy, custom, or practice.

126. URT was also acting under color of state law because its actions set forth herein are done at the behest of the City

127. As a result of this policy, custom, or practice, the disposal of Plaintiffs' vehicles, as well as the disposal of the vehicles of all members of the Notice Class, was unlawful and undertaken without any legal authorization.

128. The misconduct described herein was objectively unreasonable and undertaken intentionally with deliberate indifference to the constitutional rights of Plaintiffs and members of the Notice Class. Alternatively, the misconduct described herein was undertaken intentionally, with malice, and/or with reckless indifference to the constitutional rights of Plaintiffs and members of the Notice Class.

129. As a result of this policy, custom, or practice, the City deprived Plaintiffs and members of the Notice Class of their constitutional rights to be free from unreasonable seizures. As a direct and proximate cause of this deprivation of constitutional rights, Plaintiffs and members of the Notice Class suffered the loss of their vehicles and other damages.

**WHEREFORE**, Plaintiff prays that the Court:

A. Certify this case as a class action, designate Plaintiffs as class representatives and appoint Plaintiffs' counsel as class counsel;

B. Award Plaintiffs and members of the Notice Class restitution and damages in an amount to be determined herein, including pre- and post-judgment interest;

C.     Grant an award of reasonable attorneys' fees and all expenses and costs of this

action; and

D.     Order such other and further relief as this Court deems equitable, just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues that may be tried and decided by jury.

Dated: February 25, 2020

                                              Respectfully submitted,

                                              By: _____/s/ Jacie C. Zolna_____
                                                  One of Plaintiffs' Attorneys

Myron M. Cherry
mcherry@cherry-law.com
Jacie C. Zolna
jzolna@cherry-law.com
Benjamin R. Swetland
bswetland@cherry-law.com
Jeremiah Nixon
jnixon@cherry-law.com
Jessica C. Chavin
jchavin@cherry-law.com
MYRON M. CHERRY & ASSOCIATES LLC
30 North LaSalle Street, Suite 2300
Chicago, Illinois 60602
(312) 372-2100
Firm No. 39807
*Attorneys for Plaintiffs and the Classes*

34